UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ADELANA AKINDES, OSCAR WALTON,
DANICA GAGLIANO-DELTGEN, and
VICTOR GARCIA, on behalf of themselves
and other similarly situated individuals,

               Plaintiffs,                             CASE NO. 20-CV-1353

v.

CITY OF KENOSHA and
KENOSHA COUNTY,

               Defendants.

---

## CITY OF KENOSHA'S BRIEF IN SUPPORT
## OF ITS MOTION TO DISMISS

---

The City of Kenosha, by its attorneys, MUNICIPAL LAW & LITIGATION GROUP, S.C., respectfully submits this Brief in Support of its Motion to Dismiss.

The City of Kenosha recently faced unprecedented riotous activity during protests, including nationally observed and documented destructive activity of property and persons. To protect the community, a State of Emergency Curfew Order was implemented and arrests followed for violations of the Emergency Curfew Order. The City has never faced such a situation before and, therefore, lacks a track record sufficient to build a civil rights claim under the law. The Plaintiffs here should not be able to hold the City of Kenosha financially liable based on formulaic conclusions and speculation about motives and what the future might hold for protest activities, all while overlooking the fact that probable cause for their own arrests in violation of the Emergency Curfew Order may serve as not only a bar to their First Amendment retaliatory arrest claims but may deprive this Court of subject matter jurisdiction.

1

**BACKGROUND**

On September 1, 2020, Plaintiffs filed their Complaint in this action. Plaintiffs allege constitutional violations stemming from enforcement of a State of Emergency curfew enacted in Kenosha County to curb violence associated with protests following the shooting of Jacob Blake on August 23, 2020. (Dkt. 1, Compl. ¶¶ 8-10, 13.). Demonstrations in response to such "police brutality" began "almost immediately." (*Id*., ¶ 8).

During the course of these demonstrations, Plaintiffs acknowledge there was "destructive activity, (*Id*., ¶ 10), albeit only with scant reference in their Complaint. The rioting, mayhem and attacks on person and property were extensive, making national news and catching the attention of the President, Governor and National Guard.

Although the curfew was widely known, having been publicized by the Kenosha County Sheriff, (*Id*., ¶ 13) – as well as media outlets[1] – Plaintiffs allege lack of clarity about whether it was validly enacted. (*Id*., fn. 1). To be sure, the Emergency Curfew was valid, reasonable and necessary. The Mayor orally proclaimed the initial curfew pursuant to Wis. Stat. § 323.14(4) (mayor's authority) from the night of August 23 through to the Council's meeting in the early evening of August 25. Under Wisconsin law, the City Council may declare a state of emergency:

> The governing body of any local unit or government may declare, by ordinance or resolution, an emergency existing within the local unit of government whenever conditions arise by reason of a riot or civil commotion, a disaster, or an imminent threat of a disaster, that impairs transportation, food or fuel supplies, medical care, fire, health or police protection, or other critical systems of the local unit of government. The period of the emergency shall be limited by the ordinance or resolution to the time during which the emergency conditions exist or are likely to exist.

---

[1] *See e.g.*, https://www.nbcchicago.com/news/local/kenosha-curfew-to-remain-in-effect-through-labor-day-officials-say/2331849/; https://www.wbay.com/2020/08/30/kenosha-curfew-extended-through-at-least-wednesday-morning/; https://www.tmj4.com/news/local-news/emergency-curfew-extended-in-kenosha-through-tuesday

Wis. Stat. § 323. 11.   Any person who "intentionally fails to comply with an order issued by an agent of the state or of a local unit of government who is engaged in emergency management activities" is subject to a forfeiture of not more than $200.00. Wis. Stat. §323.28.   By City of Kenosha Common Council Resolution, the Council declared an emergency due to riotous activity including burning building premises, burning of personal property, burning of government property, vandalism and otherwise damage producing activity, as well as personal injury.[2] This Resolution granted the Mayor powers associated with authority of a Mayor in an emergency situation identified in Paragraphs 1.145A (and all its subparts) of the Code of General Ordinances, which as relevant to this lawsuit, included the power "[t]o order a curfew for the general public or any segment of the general public in all or any portion of the City."[3]

The Emergency Curfew was in place from August 23, 2020 to September 2, 2020.   On August 23, 2020, the Kenosha County Sheriff's Department issued a media release announcing a curfew.[4] The media release stated the following:

> The County of Kenosha has declared a state of Emergency Curfew for 10:15 p.m. tonight August 23rd. The public needs to be off the streets for their safety. The Kenosha Sheriff's Department will be enforcing the curfew until 7:00 a.m.[5]

---

[2]  Resolution 134-20: Declaration of Emergency Regarding Civil Unrest Granting Additional Authority to the Mayor. Attested and approved on August 27, 2020. The signed version is online under a section titled "Adopted Ordinances & Resolutions" found here: https://www.kenosha.org/images/agenda_meeting/CC/2020_ORD_RES.pdf

[3] City Code of General Ordinances 1.145(A)(10), available at:  https://www.kenosha.org/images/GENORD.pdf see p. I-45 to I-46.

[4] This Court can take judicial notice of the Kenosha County Sheriff's Office media releases announcing the State of Emergency Curfew because they are not in dispute and matters of public records. The media releases are publicly available at the Kenosha County Sheriff's Department website: https://www.kenoshacounty.org/CivicAlerts.aspx?CID=16.   "A document posted on a government website is presumptively authentic if government sponsorship can be verified by visiting the website itself." *Qui Yun Chen v. Holder*, 715 F.3d 207, 212 (7th Cir. 2013). *See also, Gent v. CUNA Mut. Ins. Society*, 611 F.3d 79 (1st Cir. 2010) (taking judicial notice of facts on CDC website) *Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003) (taking judicial notice of information found on National Personnel Records Center's website); *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information from official website of the FDIC).

[5]  "Countywide emergency curfew in effect until 7a.m. Monday, Aug. 24," available at https://www.kenoshacounty.org/CivicAlerts.aspx?AID=1799.

On August 24 and 25, Kenosha County Sheriff's Department issued similar media releases announcing a curfew beginning at 8:00 p.m. for the area "East of I-94."[6] Also on August 25, 2020, Kenosha County Sheriff David Beth issued a press release pleading with the public to abide by the curfew and not to engage in destructive behavior.[7] Sheriff Beth stated, in part,

> The best thing our residents can do to stay safe is to stay home tonight and abide by the curfew that will be in effect from 8 p.m. until 7 a.m. tomorrow. If you want to protest peacefully, by all means go out and do it. It's your right. But don't be part of this destructive force that's burning our community. That's not a productive path to justice.

On August 26, the Emergency Curfew was issued from 7:00 p.m. to 7:00 a.m. for the area "East of I-94" and through Sunday, August 30th.[8] On August 30, the Emergency Curfew was issued for August 31 and September 1 from 7:00 p.m. to 7:00 a.m. for the same area.[9] On September 1, Kenosha County Sheriff's Department issued a media release stating that the Emergency Curfew would remain in effect from 7:00 p.m. to 7:00 a.m. through September 2 at 7:00 a.m.[10] The release went on to state that, beginning September 2, the Emergency Curfew would be in effect from 9:00 p.m. to 7:00 a.m. and would remain in effect through September 7 at 7:00 a.m.

On September 2, the curfew ended.[11] The Kenosha County Sheriff's Department released the following statement:

---

[6] "Emergency Curfew again in effect for night of Monday, Aug. 24," available at https://www.kenoshacounty.org/CivicAlerts.aspx?AID=1804; "State of Emergency Curfew in effect east of I-94 Tuesday night, Aug. 25," available at, https://www.kenoshacounty.org/CivicAlerts.aspx?AID=1810.

[7] "Tuesday evening, Aug. 25, Statement from Kenosha County Sheriff David Beth," available at https://www.kenoshacounty.org/CivicAlerts.aspx?AID=1811.

[8] "State of Emergency Curfew to begin at 7 p.m. each night through Sunday Aug. 30," available at https://www.kenoshacounty.org/CivicAlerts.aspx?AID=1814.

[9] "State of Emergency Curfew west of I-94 to continue nightly through Tuesday, Sept. 1, available at https://www.kenoshacounty.org/CivicAlerts.aspx?AID=1823.

[10] "Nightly curfew to continue through night of Sept. 6; to begin at 9 p.m. Wednesday-Sunday," available at https://www.kenoshacounty.org/CivicAlerts.aspx?AID=1827.

[11] "UPDATE: Nightly State of Emergency Curfew now suspended," available at, https://www.kenoshacounty.org/CivicAlerts.aspx?AID=1829.

As of today September 2nd, 2020 Kenosha County has ended the State of Emergency Curfew. That decision was announced today after consultation with law enforcement and community leaders.

Kenosha Mayor John Antaramian said:

"After consulting with local law enforcement agencies, I have decided the curfew is no longer needed. The last several nights have been relatively peaceful in the community, and in the judgment of law enforcement, it is appropriate to remove the curfew. However, criminal activity will not be tolerated and arrests will be made if needed. I am hopeful there will be no need to reinstate the curfew in the near future."

Plaintiffs are made up of residents of both the Kenosha and Milwaukee area and all allege to be protestors with viewpoints against the police in Kenosha during the above times. (Dkt. 1, Compl. ¶¶ 29-30, 33-34, 37-38, 41-42.) Plaintiffs assert they were all arrested for violating the Emergency Curfew. (Dkt. 1, Compl. ¶¶ 31, 35, 39, 43.) Plaintiffs' Complaint asserts the Kenosha Police and Sheriff's Office "use [the State of Emergency curfew] as a tool to silence those peaceful protesters who dare to confront this police department's brutality." (Dkt. 1, Compl. ¶ 26.) The Complaint asserts that "[e]ven though there were both pro-police and anti-police brutality protestors, ONLY anti-police protesters have been arrested under this ordinance." (Dkt. 1, Compl. ¶ 23.)

Finally, Plaintiffs each assert they intend to continue to protest in Kenosha but will either be arrested or chilled from participating in such protests for fear of arrest. (Dkt. 1, Compl. ¶¶ 32, 36, 40, 44.)

Plaintiffs' bring a proposed class-action lawsuit against both the City of Kenosha and Kenosha County. The Complaint alleges the following claims: First Amendment retaliation, Equal Protection selective enforcement due to alleged differential treatment, and a First Amendment facial challenge against the curfew. Of these, the First Amendment retaliation claim is paramount, receiving robust attention throughout the Complaint about how they have been retaliated against

and targeted for their anti-police protesting. (Dkt. 1, Compl. Intro and ¶¶ 45, 55, 58, 59, 61, 66). The Complaint seeks class certification, injunctive relief, declaratory relief, and damages. (*Id*.)

## STANDARD OF REVIEW

When considering a Rule 12(b)(6) motion to dismiss, a court should accept "the well-pleaded facts in the complaint as true." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). This standard, however, is not a free pass to the federal courthouse: "Importantly, the Supreme Court's decisions in *Twombly* and *Iqbal* ushered in a requirement that civil pleadings demonstrate some merit or plausibility in complaint allegations to protect defendants from having to undergo costly discovery unless a substantial case is brought against them." *United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013).

To survive a Rule 12(b)(6) motion, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* At a minimum, the complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully…. When a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678. If allegations give rise to an "obvious alternative [legitimate] explanation" for the allegedly wrongful conduct, the claim fails

6

to meet the plausibility requirement and must be dismissed. *Id.* at 678. Moreover, "[i]f discovery is likely to be more than usually costly, the complaint must include as much factual detail and argument as may be required to show that the plaintiff has a plausible claim." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).

Finally, in evaluating a Rule 12(b)(6) motion, "courts are free to consider ... exhibits attached to the complaint, Fed. R. Civ. P. 10(c), or documents referenced in the pleadings if they are central to the claim." *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

In addition to the standards set forth governing Rule 12(b), courts may take judicial notice of an adjudicative fact that is both "not subject to reasonable dispute" and either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). The standard "is premised on the concept that certain facts or propositions exist which a court may accept as true without requiring additional proof from the opposing parties. It is an adjudicative device that substitutes the acceptance of a universal truth for the conventional method of introducing evidence." *General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1081 (7th Cir. 1997).

Under this standard, for example, court records, including the charges and scheduling of Plaintiffs' criminal court cases, may be judicially noticed because they are not in dispute and constitute court records and public records. Indeed, "the most frequent use of judicial notice of ascertainable facts is in noticing the contents of court records." 21 Charles Alan Wright & Kenneth W. Graham Jr., Federal Practice & Procedure: Evidence of § 5106, at 505 (1st ed. 1977 & Supp. 1997). Wisconsin courts have recognized that records available on CCAP are "public records". *See Watton v. Hegerty* 2007 WI App 267, ¶ 26 n.17, 306 Wis.2d 542, 744 N.W.2d 619 (noting that

CCAP records for a Milwaukee County Circuit Court case are "public records of which we may take judicial notice.) *See also*, Opoka v. INS, 94 F.3d 392, 394 (7th Cir. 1996) (recognizing that proceedings in other courts, both inside and outside the federal system, may be judicially noticed); *Henson v. CSC Credit Servs*., 29 F.3d 280, 284 (7th Cir. 1994) (confirming that court documents from state proceedings are noticeable.); *Deicher v. City of Evansville*, WI, 545 F.3d 537 (7th Cir. 2008) (taking judicial notice of date of filing of complaint because the complaint is a matter of public record)

## ARGUMENT

### I. PLAINTIFF'S *MONELL* CLAIMS FAIL TO MEET THE REQUISITE PLEADING STANDARDS.

Plaintiffs' municipal liability claims fail to meet the *Twombly-Iqbal* pleading requirements. *Monell v. Dep't of Soc. Serv. of City of New York*, 436 U.S. 658, 691 (1978). To withstand a motion to dismiss, a complaint must contain facts that state a claim that is "plausible on its face," such that the defendant's liability is a "reasonable inference" from the facts. *Bell Atlantic v. Twombly*, 550 U.S. 544, 566, 570 (2007). In considering a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw reasonable inferences in favor of the plaintiff. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007).

However, while a court should assume the truthfulness of factual allegations in a complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662 678 (2009). Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not entitled to the assumption of proof, and a plaintiff must plead more than an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. at 678. Moreover, courts should not accept as adequate a pleading that contains mere "abstract recitations of the elements of a cause of action." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

The Supreme Court has thus articulated a two-part test for a motion to dismiss. *Iqbal*, 556 U.S. at 679. First, a court should identify these conclusory statements that are not entitled to the assumption of truthfulness. *Id*. at 683 (quoting *Twombly*, 550 U.S. at 570.) Second, a court should review the remaining factual allegations to determine if they "nudge" the claim "across the line from conceivable to plausible." *Id*.

"[A] municipality cannot be held liable under § 1983 on a *respondeat* superior theory." *Monell*, 436 U.S. at 691. Under *Monell*, municipal liability exists only "when execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id*. at 694. The Seventh Circuit has identified three different ways in which a municipality or other local governmental unit might violate § 1983: (1) through an express policy, statement, ordinance, or regulation that, when enforced, causes a constitutional deprivation; (2) through a "wide-spread practice" that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) through an allegation that the constitutional injury was caused by a person with "final decision policymaking authority." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). *Monell's* rules and requirements apply equally to any claim for an injunction against the municipality. *See Los Angeles County v. Humphries*, 562 U.S. 29 (2010).

Here, Plaintiffs municipal liability claims do not meet the standards set forth in *Twombly/Iqbal*.

*First,* Plaintiffs' Complaint makes no mention, whatsoever, of municipal liability on the basis of an action caused by a person with final policymaking authority. (*See generally*, Dkt. 1, Compl.)

9

*Second*, Plaintiffs' Complaint fails to identify an official written policy regarding a curfew order or any other written policies that are the subject of their lawsuit. Plaintiffs do not cite any express written policy in their Complaint. Plaintiffs even concede they are unaware of any specific written curfew order or whether any such order was enacted or approved by Kenosha County or the City of Kenosha. (Dkt. 1, Compl. fn. 1.). Regardless, Plaintiffs do not allege that any curfew, when enforced, was the cause of their alleged constitutional violations. Rather, it appears Plaintiffs' grievance is not with an alleged policy, but with respect to specific arrest decisions for arrests made for violation of the curfew. However, such bare allegations cannot give rise to *Monell* liability here: "[l]ocating a policy ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403 (1997). *See also Glisson v. Indiana Dep't of Corrs.*, 849 F.3d 372, 381 (7th Cir. 2017) ("The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?").

*Third*, Plaintiffs have not adequately pled a custom or practice claim. While a custom or practice "may be so persistent and widespread [such that it has] the force of law," "[t]he word 'widespread' must be taken seriously." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 (1970). The critical issue is whether there was a particular custom or practice that was so well-settled that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it, yet did nothing to end the practice. *Board of County Comm'r v. Brown*, 520 U.S. 397 (1997). *See, e.g., Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) (four deadly force incidents was not enough to provide the city with actual or constructive knowledge); *Gable v. City of*

*Chicago*, 296 F.3d 531, 538-539 (7th Cir. 2002) (three incidents over four-year period in which city agents erroneously informed vehicle owners that their automobiles were not impounded at city lot were too few to support municipal liability); *Robles v. City of Fort Wayne*, 113 F.3d 732, 737 (7th Cir. 1997) (evidence failed to support plaintiff's claim that City had policy of investigating citizen complaints against police officers in such way as to exonerate officer where evidence indicated four citizen complaints against officer were not sustained while fifth was sustained after internal investigation).

To demonstrate that a municipality "is liable for a harmful custom or practice, the plaintiff must show that [municipal] policymakers were deliberately indifferent as to the known or obvious consequences." *Thomas*, 604 F.3d at 303. "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id*. Under this stringent standard, "it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once." *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). Rather, "what is needed is evidence that there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not the kind of isolated incident [*Bd. of Cty. Comm. of Bryan Cty. v. Brown*, 137 L. Ed. 2d 626 (1997)] held cannot support municipal liability." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

Proof of deliberate indifference can take one of two forms: (1) "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need"; or (2) "a

repeated pattern of constitutional violations" made the deficiencies in the systems "plainly obvious to the city policymakers." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007*). See also Connick v. Thompson*, 131 S. Ct. 1350, 1365 (2011) (while "highly predictable" is a viable basis to establish deliberate indifference, it was not highly predictable in this case that failure to better train prosecutors on Brady obligations would have had resulted in the production of the exculpatory evidence and prevented plaintiff's wrongful conviction).

Deliberate indifference is a high bar. For example, in *McCauley v. City of Chicago*, 671 F.3d 611 (7th Cir. 2011), the Seventh Circuit held that the complaint, which alleged an equal protection claim, failed to meet the pleading standards under *Twombly/Iqbal*. The core allegation in *McCauley* was that the City of Chicago "failed to have adequate policies in place for the protection of female victims of domestic violence." *McCauley*, 671 F.3d at 614. The Seventh Circuit analyzed the various subparts of the complaint regarding the City of Chicago's alleged "failures" under the *Twombly/Iqbal* "plausibility" standard and determined that the alleged deficiency in failing to have "particularized practices in place for the special protection of domestic-violence victims" failed to state a claim:

> The allegations … do not plausibly suggest that the City maintained a policy or practice of selective withdrawal of police protection. To the contrary, the complaint alleges that the City failed to have particularized practices in place for the special protection of domestic violence victims. In essence, the complaint alleges that the City failed to promulgate specific policies for this particular class of crime victims, not that the City denied this class of victims equal protection. At most, the factual allegations in the complaint plausibly suggest the uneven allocation of limited police-protection services; they do not plausibly suggest that the City maintained an intentional policy or practice of omitting police protection from female domestic-violence victims as a class.

*Id*. at 618-19. The court explained that the "factual allegations are entirely consistent with lawful conduct—here a lawful allocation of limited police resources." *Id.* at 619.

Here, Plaintiffs do not make any allegations that describe or even suggest a widespread custom or practice that could support a claim of municipal liability. The Plaintiffs only point to the protests that erupted "just this week" over the Blake shooting. (Dkt. 1, Compl. ¶¶ 8-11.) They do not point to any other instances of protests, emergency orders or curfew enforcement, whether in the past or ongoing. Further, Plaintiffs do not make any factual averments suggesting an intentional policy or practice of selectively arresting "anti-police protestors" and not arresting "pro-police protestors." Plaintiffs make only the conclusory allegation that Defendants have "policies and customs" of constitutional violations and "failed to issue corrective instruction after violations were brought to light." (Dkt. Compl. ¶¶ 45-46, 61, 62.)

Such allegations cannot withstand the pleading standards under *Twombly-Iqbal*. Plaintiffs' Complaint makes no *factual* allegations that the alleged deprivations were so widespread so as to constitute deliberate indifference. Plaintiffs do not provide any factual allegations that would permit an inference of intentional selective enforcement of the Emergency Curfew. Indeed, Plaintiffs purport to be "anti-police protestors" and claim that they were arrested because of this purported affiliation. However, there is no allegation in the Complaint that any "pro-police" protestors were present in Kenosha, past curfew, when Plaintiffs were arrested and that such "pro-police protestors" were not arrested in violation of the curfew. Moreover, Plaintiffs do not set forth any factual averments regarding when any alleged violations were brought to light and what corrective action the City failed to issue. Thus, there can be no inference that any alleged violations had been occurring for any length of time.

Plaintiffs' claims are based on arrests that occurred during an unprecedented period of upheaval in Kenosha – a period that required a State of Emergency Curfew – and a period that

ended within just days. Plaintiffs' lawsuit is not based on any other past or subsequent protests or arrests. Thus, Plaintiffs cannot prove the requirement that such alleged conduct was widespread.

*Fourth*, Plaintiffs have pled no facts giving rise to municipal liability based on failure to train. To state a claim for municipal civil rights violation based on a failure to train, a plaintiff must allege that the municipality adopted a policy that amounts to "deliberate indifference to the rights of the person with whom the [untrained employees] come into contact. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Deliberate indifference is characterized as a "stringent standard of fault requiring proof that a municipal actor disregarded a known or obvious consequence of his action. *Id*. at 61. For example, a city may be deliberately indifferent if its policymakers choose to retain a program which they have actual or constructive notice that one of their training programs causes city employees to violate citizens' constitutional rights. *See generally, Connick*, 563 U.S. 51. Additionally, a city's policy of inaction in light of notice that its program will cause constitutional violations "is the functional equivalent" of a decision by the city itself to violate the Constitution. *Id*. at 61-62.

 To establish a failure to train claim, "[a] pattern of similar constitutional violations is ordinarily necessary to demonstrate deliberate indifference." *Id*. at 62. (citations omitted). Additionally, even if "a particular officer may be unsatisfactorily trained" that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton v. Harris*, 489 U.S. 378, 390-91 (1989).

Here, again, Plaintiffs fail to allege sufficient facts to establish deliberate indifference. Plaintiffs do not allege any facts that the City of Kenosha was aware of or put on notice of any allegedly unconstitutional conduct. Plaintiffs also do not allege how the City of Kenosha failed to train its officers. Nor do they even allege, through plausible facts or even threadbare legal

conclusions, that the City knew it was highly predictable that such constitutional deprivations would occur without more or different training of its police officers because there was a pattern of similar constitutional violations. "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

*Finally*, as previously noted, Plaintiffs do not allege any facts establishing that a specific policy, custom, or failure to train was *the cause* of their allegedly retaliatory arrests. Before *Monell* liability can attach, a plaintiff must also "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bryan County*, 520 U.S. at 404. The plaintiff, "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. *Id*.

For these reasons, and those set forth below, Plaintiffs' municipal liability claims as against the City of Kenosha must be dismissed.

## II. EVEN IF THE *MONELL* CLAIMS COULD BE APPROPRIATELY PLED, PLAINTIFFS' ONGOING STATE PROCEEDINGS DEPRIVE THE COURT OF SUBJECT MATTER JURISDICTION.

Additionally, the Court lacks subject matter jurisdiction in this case because Plaintiffs have not adequately pled a constitutional violation such that *Monell* liability can apply, and because the doctrines governing standing, *Younger*, and *Heck* require the Court to abstain in this instance.

### a. PLAINTIFFS' COMPLAINT DOES NOT ADEQUATELY PLEAD AN UNDERLYING CONSTITUTIONAL VIOLATION.

As explained above, the City cannot be held liable solely because the Plaintiffs allege police officers made unlawful arrests; the law of *Monell* bars *respondeat* liability theories in civil rights actions. To establish a *Monell* claim, a plaintiff must plead (1) the deprivation of a

constitutional right; (2) that action was taken pursuant to a custom, policy or practice of the local government; and (3) that such action was the cause of the deprivation. *Thompson v. Boggs*, 33 F.3d 847, 859 (7th Cir. 1994).

### i. First Amendment Retaliation Claim

Under *Nieves v. Bartlett*, —U.S. —, 139 S. Ct. 1715, 1724 (2019) plaintiffs alleging First Amendment retaliatory arrest cases must allege in their Complaint, as a threshold matter, that the decision to arrest lacked probable cause. The Supreme Court unequivocally stated in *Nieves* that "[a] plaintiff pressing a retaliatory arrest claim ***must plead and prove*** the absence of probable cause for the arrest." *Id*. at 1724 (emphasis added); *see also Lund v. City of Rockford, Ill*., 956 F.3d 938 (2020).

Here, the Plaintiffs' Complaint is bare of any factual averments that they were arrested without probable cause or that their ongoing proceedings have reached disposition favorable to them. It is unreasonable to presume, under the *Twombly/Iqbal* pleading standards, that the arrests were made without probable cause. Nor could the Plaintiffs try to plead around this as their Complaint acknowledges they were arrested for violating the curfew: if the police officers arrested them prior to the start of the curfew, minutes into it, or when their was no curfew, surely they would have grieved such allegations in their Complaint.

Acknowledging they were arrested squarely within the confines of the Emergency Curfew, Plaintiffs instead allege generally that they were arrested for their expressions. However, Plaintiffs cannot use the First Amendment as sword or shield if there was probable cause, and they certainly cannot commence section 1983 civil rights monetary claims at this time against the City when the criminal courts have yet to reach disposition of their arrests and charges. All four Plaintiffs have been charged with a violation of Wisconsin State Statute 323.28 for "Failure to Comply With

Emergency Management Order of State of Local Government," which is a non-criminal forfeiture action currently underway in the state courts. (*See generally*, Kenosha County Case Nos. 2020FO596 (Akindes), 2020FO595, 2020FO589 (Gagliano-Deltgen), 2020FO594 (Garcia) and 2020FO573 (Walton).) Plaintiffs Akindes, Gagliano-Deltgen, and Garcia have intake scheduled for October 15, 2020 and Plaintiff Walton has no intake date scheduled as of this submission.

The Plaintiffs, therefore, cannot allege *Monell* liability against the City for First Amendment constitutional deprivations in the form of retaliatory arrests under *Nieves* unless they can plead their arrests lacked probable cause. They did not do so here and cannot do so while the state court system is still evaluating the probable cause giving rise to the non-criminal forfeiture complaints against them.

Further, because the probable cause inquiry in those cases is not insurmountable, it is all the more reason under *Iqbal/Twombly* and *Nieves* to avoid presuming their retaliatory arrest claims are ripe. Probable cause is to be made based on the "totality of the circumstances" and is a fluid concept. *District of Columbia v. Wesby,* 138 S. Ct. 577, 586 (2018). Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id*. Thus, probable cause exists if a reasonable officer would have believed, at the time, that there was a probability or substantial chance the plaintiffs were failing to comply with the Emergency Curfew in violation of Wis. Stat. § 323.28.

Until the citations against the Plaintiffs reach a disposition in the state court proceedings, which will necessarily address whether they were supported by probable cause, the First Amendment retaliatory arrest claims are not mature or ripe to convey federal court subject matter jurisdiction.[12] *See Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (a city may

---

[12] It is doubtful the Plaintiffs here will surrender their Fifth Amendment rights in civil litigation until there is a disposition of the charges against them. See e.g., *Chagolla v. City of Chi*., 529 F. Supp. 2d 941, 947 (N.D. Ill. 2008)

well have "a legitimate interest in quickly dispersing and removing lawbreakers with the least risk of injury to police and others" when "arrestees were part of a group of more than 100 protesters operating in an organized and concerted effort to invade private property, obstruct business, and hinder law enforcement. Although many of [those] crimes were misdemeanors, the city's interest in preventing their widespread occurrence was significant: 'The wholesale commission of common state-law crimes creates dangers that are far from ordinary. Even in the context of political protest, persistent, organized, premeditated lawlessness menaces in a unique way the capacity of a State to maintain order and preserve the rights of its citizens.'") (*citing Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 287 (1993) (Kennedy, J. concurring)). Thus, Plaintiffs' First Amendment claim must be dismissed.

### ii. Plaintiffs' Equal Protection Selective Enforcement claim.

To establish a selective enforcement claim, a plaintiff must show that differential treatment occurred and that such differential treatment was based upon an improper, discriminatory motive. *United States v. Barlow*, 310 F.3d 1007, 1010 (7th Cir. 2002); *Desi's Pizza, Inc. v. City of wilkes-Barre*, 321 F.3d 411, 425 (3rd Cir. 2003). "It is considerably harder" to prove a selective enforcement claim, *United States v. Hare*, 820 F.3d 93, 100 (4th Cir. 2016) because it requires identification of others who were not prosecuted. *Chavez v. Illinois State Police*, 251 F.3d 612, 640 (7th Cir. 2001).

In *Swanson v. Citibank*, N.A., 614 F.3d 400, 404-405 (7th Cir. 2010) the Seventh Circuit noted that more complex equal protection claims require heightened pleading. In *Swanson*, unlike this case, the equal-protection claim was straightforward. The plaintiff brought a discrimination

---

("In the Court's experience, it is not at all rare for a person faced with criminal charges or a pending investigation to invoke the privilege even though he may have done nothing wrong, out of an abundance of caution prompted by a careful criminal defense lawyer.").

claim alleging that she was denied a home loan due to her race. *Id*. The court noted that such a straightforward discrimination claim need only contain factual assertions that plausibly identified the type of discrimination at issue, by whom, and when. *Id*. at 405. Plaintiff's complaint adequately did so because it contained allegations, for example, that one of the defendants required that her husband be present in a meeting after discovering the plaintiff's race, that one defendant made a comment about the plaintiff's race, and that a third-party appraiser valued her home at significantly higher value than did the defendants. *Id*. at 402-03. In so holding, the court noted that, in a more complex case, a plaintiff's factual pleadings *"will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiff's mind at least, the dots should be connected." Id*. at 404-05 (emphasis added).

Here, Plaintiffs assert no factual averments, beyond conclusory allegations, that any arrest decisions were made pursuant to discriminatory motive. As noted, Plaintiffs were all arrested after the curfew was in place in Kenosha, providing likely probable cause to their arrests.

Additionally, in *Sutton v. City of Milwaukee*, 672 F.2d 644, 648 (7th Cir. 1982), the Seventh Circuit held it did not offend the Constitution for the police to tow illegally parked cars of people with more than one unpaid ticket while not towing cars without such unpaid tickets. The court explained that, where resources are limited, the bare act of citing some offenders, but not others, does not offend the Constitution:

> The police have limited resources to devote to preventing violations of parking regulations; this is a fact of life concerning municipal finances and not a confession that parking regulations serve trivial social objectives. The police must allocate these resources somehow and a sensible method is to concentrate on repeat offenders. By towing the illegally parked cars of people with more than one unpaid ticket the police enforce the parking regulations most severely against those who flout them most audaciously. The sense of justice is not outraged.
>
> *Id*.

The instant case is similar. The police have limited resources and should not, without supporting facts or allegations, be assumed to have violated the Constitutional rights of citizens simply because they were unable to arrest every person allegedly in violation of the Emergency Curfew.

Further, Plaintiffs do not identify any individuals that were not arrested *because of* their viewpoints. Plaintiffs point to Kyle Rittenhouse as the only example of a "pro-police counter-protestor." (Dkt. 1, Compl. ¶ 17.) However, Plaintiffs make no showing, beyond their conclusory assumptions, that Kyle Rittenhouse was a "protestor" in Kenosha or that he was there to express "pro-police" views. Nor do Plaintiffs assert that Kyle Rittenshouse was in Kenosha during the same time period that they were in Kenosha, or even that Kyle Rittenhouse was not arrested by police. The same is true as to any "similarly-situated" protestors, which as noted are not alleged with any degree of plausibility in the Complaint. The Complaint makes no factual averments supporting a claim that there were any non-arrests of people who violated curfew to protest in support of the police- for example, the names of the individuals, the date and times the individuals were in Kenosha, the purpose behind the individuals attendance in Kenosha, whether the individual was intending to protest against the police, or whether Kenosha Police had knowledge of any particular arrestee's political beliefs or viewpoints. Thus, Plaintiff's equal protection claim must be dismissed.

**b. THE DOCTRINES GOVERNING STANDING, YOUNGER, AND HECK REQUIRE DISMISSAL.**

The curfew has been lifted and the demonstrations have subsided, raising additional jurisdictional concerns whether the doctrines governing standing and the doctrines of *Younger v. Harris*, 401 U.S. 37, 54-55 (1971) and *Heck v. Humphrey*, 512 U.S. 477 (1994) require dismissal of some or all of the claims.

### i. Standing.

Standing requires that (1) a plaintiff has suffered an injury in fact; (2) there exists a causal connection between the injury and the conduct of the defendant; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Article III requires the existence of an actual case or controversy at every phase of the proceedings. *Jones v. Sullivan*, 938 F.2d 801, 805 (7th Cir. 1991) To meet this requirement, a plaintiff requesting *prospective* equitable relief must hold a "personal stake" in the outcome by showing a "significant likelihood and immediacy of sustaining some injury." *Sierakowski v. Ryan*, 223 F.3d 440, 443-44 (7th Cir. 2000). However, absent a showing of continuing, present adverse effects, past exposure to illegal conduct does not present a case or controversy for purposes of injunctive relief. *O'Shea v. Littleton*, 441 U.S. 488, 495 (1974). In a class action lawsuit, if none of the named plaintiffs representing a class meet the standing requirements, none of the plaintiffs may seek relief on behalf of himself or herself, or any other member of the class. *O'Shea*, 414 U.S. at 494.

In *O'Shea v. Littleton*, a class of plaintiffs claimed to have been subjected to discriminatory enforcement of criminal law and sought injunctive relief. 414 U.S. 488 (1974). Although it was claimed that particular members of the class had actually suffered from the alleged unconstitutional practices, the Supreme Court determined that the plaintiffs failed to allege an actual case or controversy because "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Id*. at 495-496. Past wrongs were evidence bearing on "whether there is a real and immediate threat of repeated injury." *Id*. at 496. But the prospect of future injury rested "on the likelihood that [plaintiffs] will again be arrested for and charged with

violations of the criminal law and will again be subjected to bond proceedings, trial, or sentencing before petitioners." *Id*. The Court ruled that such a threat to plaintiffs was not "sufficiently real and immediate to show an existing controversy simply because they anticipate violating lawful criminal statutes and being tried for their offenses . . . . *Id.* at 496. *See also Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (holding that plaintiff's argument that he might be pulled over, arrested, and again subjected to an unconstitutionally long detention "is layered with hypothetical and nowhere near certain.").

The Supreme Court reiterated these principles in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983):

> Another relevant decision for present purposes is Rizzo v. Goode, 423 U. S. 362 (1976), a case in which plaintiffs alleged widespread illegal and unconstitutional police conduct aimed at minority citizens and against city residents in general. The Court reiterated the holding in O'Shea that past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy. The claim of injury rested upon "what one of a small, unnamed minority of policemen might do to them in the future because of that unknown policeman's perception" of departmental procedures. 423 U. S., at 372. This hypothesis was "even more attenuated than those allegations of future injury found insufficient in O'Shea to warrant [the] invocation of federal jurisdiction." Ibid. The Court also held that plaintiffs' showing at trial of a relatively few instances of violations by individual police officers, without any showing of a deliberate policy on behalf of the named defendants, did not provide a basis for equitable relief.

Under the above standards, Plaintiffs lack standing to seek the injunctive relief set forth in their Complaint. Plaintiffs cannot show an existing controversy because any argument that they might be arrested in the future is layered with hypothetical and speculation.

### ii. The *Younger* and *Heck* Doctrines.

The doctrine of *Younger* abstention prevents a state criminal defendant from asserting ancillary challenges to ongoing state criminal procedures in federal court. *Younger v. Harris*, 401 U.S. 37, 54-55 (1971). The doctrine requires a federal court to abstain from hearing a case before

it when there is an ongoing state proceeding and is grounded in "longstanding public policy against federal court interference with state court proceedings. *Steffel v. Thompson*, 415 U.S. 452, 460-61 (1974).

The reason for abstention, as set forth by the Supreme Court in *Younger*, is three-fold:

(1) the basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at all and will not suffer irreparable injury if denied equitable relief;

(2) to prevent erosion of the role of the jury and avoid duplication of legal proceedings and legal sanctions where a single suit would be adequate to protect the rights asserted; and

(3) the notion of 'comity,' that is, a proper respect for state functions, a recognition that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in separate ways.

*Younger,* 401 U.S. at 43-45.

The doctrine of *Younger* abstention is so fundamental to jurisprudence, that an exception only exists when a plaintiff can show irreparable injury that is both great and immediate. *Id*. at 46. In *Younger*, the Supreme Court expressly dismissed the idea that injuries such as "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution" could, by themselves, constitute such irreparable injury. *Id*. Thus, federal injunctions are not to be granted against criminal statutes, as a matter of course, even if such statutes are unconstitutional. *Watson v. Buck*, 313 U.S. 387, 400 (1941) Instead, the Court in *Younger* directed that an alleged injury was only irreparable, such that would warrant federal intervention, if the threat to the plaintiff's federally protected rights cannot be eliminated by a defense in a criminal prosecution. *Younger*, 401 U.S. at 43-45.

In *Younger*, the federal plaintiff requested the district court find unconstitutional the law under which the government was prosecuting him, which would effectively foreclose his prosecution. Similarly, here, *the equitable relief requested by the Plaintiffs is aimed specifically at their state prosecutions*: Plaintiffs seek injunctive relief regarding the curfew and a declaration that the curfew they violated is unconstitutional. Thus, *Younger* abstention applies.

Moreover, the claims here involve constitutional issues that these Plaintiffs have the ability to litigate during the course of the state proceedings. *Gakuba v. O'Brien*, 711 F.3d 751 (7th Cir.2013). Such issues do not present a danger of irreparable and immediate loss and deciding these issues in federal court could undermine the state court proceedings. *Simpson v. Rowan*, 73 F.3d 132 (7th Cir. 1995). Instead, Plaintiffs can litigate their state charges to the fullest extent within the Wisconsin state court system. They have the appeal process and post-conviction relief. Only when their Wisconsin state proceedings are over can the federal courts hear her their claims. *Simpson v. Rowan*, 73 F.3d 132 (7th Cir. 1995); *Edwards v. Takaca*, 2016 WL 2853561 (E.D. Wis. 2016).

Additionally, if this case were allowed to proceed, it could contradict a finding of probable cause for the arrest and run afoul of *Heck v. Humphrey* which held that:

> In order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, … a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. 28 U.S.C. § 2254.

512 U.S. 477 (1994). The favorable-termination requirement applies whenever "a judgment in favor of the plaintiff would necessarily imply" that his conviction or sentence was invalid. *Id*. at 487.

As noted by the Supreme Court in *Wallace v. Kato*, "[i]f a plaintiff files a false-arrest claim before he has been convicted (or files any other claim related to rulings that will likely be made in a pending or anticipated criminal trial), it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of the criminal case is ended." 549 U.S. 384, 393. Upon conviction, "if the stayed civil suit would impugn that conviction, *Heck* will require dismissal."

Here, Plaintiffs state court proceedings remain pending in Kenosha County Circuit Court. Should Plaintiffs ultimately be convicted, the *Heck* doctrine requires that their case be dismissed.

## III. PLAINTIFFS' FIRST AMENDMENT FACIAL CHALLENGE IN COUNT III FAILS TO STATE A CLAIM.

The City joins and incorporates in full the County's Brief in Support of its Motion to Dismiss at Section IV in this regard. The emergency curfew hours in this case fall well within the constitutional tolerances of those legal authorities and others. *See also Vic Sasso v. City of Dallas*, Case No. 3:20-CV-1398-S, 2020 WL 2839217 (N.D. Texas, Dallas Division, June 1, 2020) (denying request for temporary restraining order regarding Dallas' curfew prohibiting all persons from traveling on any public street from 7pm-6am in certain parts of the city following protests precipitated by the death of George Floyd finding no irreparable harm and finding the curfew analogous to "reasonable time, place, and manner restrictions" upheld by the Supreme Court.); *Martin v. Warren*, Case No. 20-CV06538 CJS, 2020 WL 5035612 (W.D. NY, Aug. 26, 2020) (denying request for preliminary injunctive relief regarding Rochester's Emergency Order restricting gatherings, of more than four persons outdoors and more than nine persons indoors, between the hours of 11pm-5am in an effort to prevent the spread of Covid-19 and contain civil unrest following the death of George Floyd because plaintiffs were unlikely to succeed on the merits.).

## IV. BECAUSE THE STATE OF EMERGENCY CURFEW IS NO LONGR IN EFFECT AND BECAUSE THE PROTESTS HAVE SUBSIDED, PLAINTIFFS' CLAIMS ARE MOOT INSOFAR AS THEY SEEK INJUNCTIVE RELIEF OR ARE BASED ON ALLEGED FEAR FROM FUTURE ENFORCEMENT.

Plaintiffs' action seeks (1) a temporary restraining order barring the City of Kenosha and Kenosha County "from enforcing the State Emergency or any similar measure and from discriminatory enforcement of any ordinance on the basis of any individual's viewpoint or opinion; (2) injunctive relief "barring Defendants from engaging in unconstitutional conduct;" (Dkt. 1, Compl. p. 14.) However, these requests are moot.

Plaintiffs' requests are moot because the State of Emergency Curfew ended on September 2, 2020 and there is no allegation that the curfew will be reinstated in the future. Nor is there any allegation that the protests are continuing. By all accounts, the recent protests in Kenosha were unprecedented, but have now subsided. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York,*---U.S.----, 140 S. Ct. 1525, 1526, ----L.Ed.2d ----- (2020) (holding that a claim for injunctive relief against a law was moot when the law was amended to give "the precise relief that [the plaintiffs] requested").

In *Federation of Advertising Industry Representatives, Inc. v. City of Chicago,* 326 F.3d 924, (7th Cir. 2003), the court held that "the complete repeal of a challenged law renders a case moot, unless there is evidence creating a reasonable expectation that the City will reenact the ordinance or one substantially similar." The court further stated, "[i]n a string of cases, the [Supreme] Court has upheld the general rule that repeal, expiration, or significant amendment to challenged legislation ends the ongoing controversy and renders moot a plaintiff's request for injunctive relief. *Id.* at 929-930.

An unprecedented civil unrest occurred in Kenosha following the shooting of Jacob Blake. During this time, the State of Emergency Curfew was enacted in an effort to curb violence and destruction during the nighttime hours – violence and destruction that the Plaintiffs acknowledge. The curfew was tailored to the area experiencing violence. Moreover, Plaintiffs do not allege that any time prior to or after the protests following the shooting of Jacob Blake, were they ever placed under curfew or arrested for violating the same. Nor is there any indication that Plaintiffs will be arrested in the future for curfew violations, as the State of Emergency Curfew is no longer in place.

Additionally, any concern over a future arrest, or other irreparable harm, is based purely on speculation and is insufficient to establish injunctive relief. *See also Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (holding that plaintiff's argument that he might be pulled over, arrested, and again subjected to an unconstitutionally long detention "is layered with hypothetical and nowhere near certain."); *Portis v. City of Chicago*, 347 F.Supp.2d 573 (N.D. Ill, 2004) (holding that plaintiffs lacked standing to seek injunctive relief where plaintiffs alleged they were unlawfully detained for prolonged periods of time after arrests for non-custodial ordinance violations where all plaintiffs had been released from incarceration and were no longer subject to challenged practice, and they failed to show sufficient likelihood of future injury.); *Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) (holding that plaintiff seeking TRO against correctional institution based upon plaintiff's alleged "virtual certainty" to be returned to the institution was not enough.) Similarly, the Court should dismiss Plaintiffs' request for injunctive relief here.

## **CONCLUSION**

For the aforementioned reasons, City of Kenosha respectfully requests that all claims alleged against the City of Kenosha be dismissed with prejudice for failure to state a claim.

Dated this 23rd day of September, 2020.

MUNICIPAL LAW & LITIGATION
GROUP, S.C.

Attorneys for City of Kenosha

By:     s/ Samantha R. Schmid
            REMZY D. BITAR
            State Bar No: 1038340
            SAMANTHA R. SCHMID
            State Bar No. 1096315
            730 N. Grand Avenue
            Waukesha, WI 53186
            O: (262) 548-1340
            F:  (262) 548-9211
            E:       rbitar@ammr.net
                     sschmid@ammr.net