# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ADELANA AKINDES, OSCAR
WALTON, DANICA GAGLIANO-
DELTGEN, and VICTOR GARCIA,

           Plaintiffs,

v.

CITY OF KENOSHA, KENOSHA
COUNTY, DAVID BETH, DANIEL
MISKINIS, and JOHN DOES 1–100,

           Defendants.

Case No. 20-CV-1353-JPS

**ORDER**

On September 1, 2020, Plaintiffs filed a complaint alleging civil rights violations arising from a protest in Kenosha County, Wisconsin, in which they sought declaratory and injunctive relief and damages. (Docket #1). Defendants in this case are Kenosha County and Sheriff David Beth (the "County Defendants"), as well as the City of Kenosha, Kenosha Police Chief Daniel Miskinis, and John Doe police officers (the "City Defendants") (collectively "Defendants"). Defendants filed motions to dismiss, (Docket #6, #11), which were mooted by Plaintiffs' amended complaint, (Docket #16). Defendants renewed their motions to dismiss, (Docket #17, #23), which are now fully briefed. For the reasons explained below, the County Defendants' motions will be granted, and the City Defendants' motions will

be granted in part and denied in part.[1] The Court will allow Plaintiffs leave to amend where the interest of justice so requires. Fed. R. Civ. P. 15(a)(2).

## 1.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of complaints that "fail[] to state a claim upon which relief can be granted." To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (citation and alteration omitted). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kubiak*, 810 F.3d at 480–81. However, the Court "need not accept as true 'legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements.'" *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678) (alterations omitted).

---

[1] Because Plaintiffs subsequently dropped their claim for injunctive relief (Docket #26 at 15), the Court will not address the City Defendants' standing arguments.

## 2.    RELEVANT ALLEGATIONS

### 2.1    Factual Background

On August 23, 2020, members of the Kenosha Police Department ("KPD") shot a Black man named Jacob Blake ("Blake") during an arrest. A bystander caught the shooting on camera and shared it online. This shooting was one of several recent, public acts by police officers across the country that resulted in death or injury to a Black person. Accordingly, the shooting had a galvanizing effect on the people of Kenosha. Angered by KPD's apparent use of excessive force, several hundred protesters gathered on the city's streets to decry police brutality specifically as it affected Black people.

The issue of police brutality turned out to be a contentious one. Police supporters, many armed with weapons, gathered to counter-protest. Although the amended complaint refers to both pro-police-brutality and anti-police-brutality protesters as "protestors," the Court will adopt different lexicon for ease of reference. The Court will refer to the group protesting KPD's excessive-force practices as "protestors." It will refer to the group of people who appeared in support of the police as "counter-protesters."

The competing protests went on for approximately nine days. For the most part, they were peaceful; however, there were isolated incidents of violence. For example, two days into the protests, on August 25, a counter-protester named Kyle Rittenhouse killed two protestors. No protestors killed any counter-protestors.

On August 23, the first night of the protests, Kenosha County Sheriff David Beth ("Beth") declared a state of emergency and issued an order imposing an emergency curfew. The curfew ran from 10:15 p.m. to 7:00 a.m.

The curfew order explains that "[t]he public needs to be off the streets for their safety." (Docket #16-3). The order contained no exceptions.

The next day, August 24, the protests continued. Beth declared another state of emergency and imposed another curfew. This time, the curfew began at 8:00 p.m. for the area "[e]ast of I-94" and lasted until 7:00 a.m. the next day. (Docket #16-4). In Kenosha County, the area east of I-94 encompasses approximately 49 square miles. That night, KPD Chief Daniel Miskinis ("Miskinis") ordered his officers to arrest people who violated the curfew.

The same series of events occurred on August 25, the day that Kyle Rittenhouse killed two protesters, and again on August 26—except, on August 26, the curfew began at 7:00 p.m. and lasted through 7:00 a.m. (Docket #16-6). The curfews contained no exceptions. Beth continued issuing curfew orders through September 2, 2020. (Docket #16 ¶ 75).

According to the amended complaint,[2] KPD officers treated the protestors and counter-protestors differently. Specifically, KPD officers did not enforce the curfew against the counter-protesters. Rather, KPD officers thanked the counter-protesters for their help and offered them (including Kyle Rittenhouse and his associates) water. *Id.* ¶¶ 41–43. The complaint also

---

[2] The amended complaint makes use of video exhibits. Federal Rule of Civil Procedure 8 requires a short, plain *statement* of facts. "When ruling on a motion to dismiss, the court may consider documents attached to the complaint, documents central to the complaint and referred to in it, and information that is properly subject to judicial notice." *Amin Ijbara Equity Corp. v. Village of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017) (citation and alterations omitted). Thus, while the Court may consider documents that are germane to the complaint and subject to judicial notice, such as the emergency orders and ordinances attached to the complaint, it is not appropriate to consider evidence. Complaints are for allegations, not proof.

alleges that KPD pushed the protestors towards the counter-protesters, telling the counter-protesters to "deal" with the protesters. *Id.* ¶ 40.

Over nine days, KPD officers arrested over one-hundred and fifty protestors for violating the curfew. KPD officers did not arrest a single counter-protestor. The amended complaint alleges that the City Defendants did not enforce the curfew in a viewpoint-neutral manner.

Plaintiffs are all protestors who attended the protests in Kenosha to speak out against police brutality. Each plaintiff was arrested for violating the curfew. Each plaintiff alleges that while they "intend[] to continue to protest" police violence in Kenosha, they "will either be arrested for such conduct in the future or will be chilled from participating in such protests for fear of arrest." *See id.* ¶¶ 57, 60, 65, 69.

The amended complaint further alleges that the City of Kenosha has established a pattern and practice of "retaliating on the basis of the [anti-police-violence] viewpoint expressed, and of enforcing certain ordinances on the basis of race[3] and viewpoint." *Id.* ¶ 70. Specifically, the City Defendants exclusively arrested protestors for violating the curfew. The complaint alleges that Miskinis is "the final decision maker" for KPD and the City of Kenosha, and that Beth is the "final decision maker" for Kenosha County. The complaint stridently alleges that Beth had no authority to impose the state of emergency or the curfews.

## 2.2 Sources of Authority for Kenosha County

The amended complaint refers to Kenosha County Ordinance 5.03, which explains how a state of emergency should be declared, and includes

---

[3] This is the only allegation regarding racially discriminative curfew enforcement in the amended complaint.

the ordinance's chapter as an exhibit. Ordinance 5.03, as well as the ordinances that follow it, shed some light on who had authority to issue the curfew.

### 5.03   LOCAL EMERGENCY DECLARATION

(1) Whenever the County Executive determines that a natural or man-made disaster has occurred, or that enemy action is imminent, the County Executive has the authority to declare a local emergency.

(2) Notification. Whenever the County Executive declares a local emergency under this ordinance, he shall notify the County Board of Supervisors forthwith by filing a written declaration with the County Clerk on the first regular business day following the declaration, in a form substantially as follows: [Declaration of Emergency Form]

(3) The County Clerk shall present the notification described in (2) to the Board of Supervisors at its first meeting following such declaration.

(4) In the absence of the County Executive, the successor designated in section 5.07 shall make the declaration of emergency described in (2).

### 5.04 EMERGENCY POWERS OF THE COUNTY EXECUTIVE

In the event of a declared statewide or local emergency covered under State law or this Ordinance, the County Executive shall have, without limitation due to enumeration, the following powers:
. . .

(10) **Without restricting the power of the Sheriff, to order a curfew for the general public** or any segment of the general public in all or any portion of the County.

### 5.05   LIMITATIONS [on the County Executive's Power]

(1) Sheriff's Powers. The above specified powers are limited to the extent that they may not restrict the constitutional

powers of the Sheriff to use those resources, equipment, and employees ordinarily under his direction and control and available to him to save lives and protect property.

5.07 COUNTY EMERGENCY MANAGEMENT ORGANIZATION - Line of Succession

In the absence of the County Executive, the charge of the day to day operations of the County under section 5.04 of this code when a disaster or emergency exists shall succeed as follows: Chairman of the Kenosha County Board of Supervisors, Vice-Chairman of the Kenosha County Board of Supervisors, and Kenosha County Sheriff . . .

(Docket #16-1 at 2–5) (emphasis added).

3.    **ABSTENTION DOCTRINES**

### 3.1    *Younger*

In *Younger v. Harris*, the Supreme Court held that federal courts should not enjoin pending state-court criminal proceedings unless the action was brought in bad faith, to harass, or if there were "any other unusual circumstance that would call for equitable relief." 401 U.S. 37, 54 (1971). The *Younger* Court expressed "no view about the circumstances under which federal courts may act when there is no prosecution pending in state courts at the time the federal proceeding is begun." *Id.* at 41.

Three years later, in *Steffel v. Thompson*, 415 U.S. 462 (1974), the Supreme Court considered whether a federal court could issue a declaratory judgment regarding the constitutionality of a state criminal statute when there was no pending prosecution. In concluding that federal courts may grant such relief, the Supreme Court explained:

Requiring the federal courts totally to step aside when no state criminal prosecution is pending against the federal plaintiff would turn federalism on its head. When federal claims are premised on 42 U.S.C. § 1983 . . . we have not

required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights.

*Id.* at 473.

In their amended complaint, Plaintiffs no longer seek injunctive relief; therefore, to the extent Defendants move to dismiss that claim pursuant to *Younger*, it is moot. Additionally, Plaintiffs' state-court cases have all been dismissed. *See Kenosha County v. Adelana S. Akindes*, Kenosha County Case Number 2020FO596; *Kenosha County v. Danika J. Gagliano-Peltgen,*[4] Kenosha County Case Number 2020FO589; *Kenosha County v. Victor A. Garcia*, Kenosha County Case Number 2020FO594; *Kenosha County v. Oscar James Walton*, Kenosha County Case Number 2020FO573, available at https://wcca.wicourts.gov. Therefore, Plaintiffs cannot "litigate their state charges to the fullest extent within the Wisconsin state court system," as Defendants contend and as *Younger* would require. (Docket #18 at 24).

Plaintiffs seek damages and declaratory relief; therefore, the principles invoked in *Steffel* are relevant here. While it is possible that Plaintiffs may face additional prosecution, "[t]he possibility that a state proceeding may lead to a future prosecution of the federal plaintiff is not enough to trigger *Younger* abstention." *Mulholland v. Marion Cnty. Election Bd.*, 746 F.3d 811, 817 (7th Cir. 2014). Indeed, holding otherwise would leave Plaintiffs without recourse for their constitutional harms. Therefore, the Court concludes that *Younger* Abstention does not apply.

---

[4]The state court has spelled this name "Peltgen," although the case caption in this case states "Deltgen."

### 3.2 *Heck* Bar

In *Heck v. Humphrey*, the Supreme Court held that a plaintiff cannot pursue a claim for damages under § 1983 if the success of that claim would essentially invalidate the plaintiff's criminal conviction or sentence. 512 U.S. 477, 487 (1994). However, there must be a criminal conviction for the *Heck* bar to apply. *Wallace v. Kato*, 549 U.S. 384, 393 (2007). The Supreme Court rejected the argument that "an action which would impugn *an anticipated future conviction* cannot be brought until that conviction occurs and is set aside." *Id.* It described this argument as "impractical"—if the anticipated future prosecution or conviction never occurs, then a harmed plaintiff could never bring a § 1983 suit. *Id.*

Here, *Heck* does not apply because Plaintiffs were not convicted. Indeed, there is not even an anticipated future conviction—the charges against Plaintiffs have been dropped.[5] If Plaintiffs find themselves embroiled in state-court proceedings once again, then this Court will revisit whether *Heck* requires a stay pending the outcome of the state-court case. *Id.* at 393–94. It is most appropriate, at this juncture, for this case to move forward.

### 4. THE COUNTY DEFENDANTS' MOTION TO DISMISS

Plaintiffs bring claims against Beth in his individual capacity and against Kenosha County. Counts One, Two, and Three are Fourteenth Amendment Due Process claims brought against Beth in his individual

---

[5]In a separate matter, a state court dismissed similar charges against different protestors and suggested that the proper statute under which to prosecute might be Wis. Stat. § 946.47. (Docket #33 at 6). However, Wis. Stat. § 946.47 applies to harboring or aiding felons. This statute seems wholly inapplicable to the circumstances, and suggests imminent criminal prosecution all the less likely.

capacity and against Kenosha County. Count Seven is a First Amendment claim brought against Kenosha County exclusively.

To pursue liability against Beth in his individual capacity, Plaintiffs must allege that (1) they suffered a constitutional violation, and (2) "the deprivation was visited upon [them] by a person or persons acting under color of state law." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citation omitted). Plaintiffs must allege that Beth personally "caused or participated" in the deprivation. *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000). To pursue liability against Kenosha County, Plaintiffs must go a step further by alleging that a municipal policy was the moving cause of the constitutional violation. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978); *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010) ("[A] municipality cannot be liable . . . when there is no underlying constitutional violation by a municipal employee."). Therefore, the Court will first determine whether Plaintiffs have adequately alleged a constitutional violation.

### 4.1    Count 1 – General Due Process

Count 1 alleges that Beth, acting *ultra vires* of his prescribed duties, unlawfully declared a state of emergency and curfew. Plaintiffs allege that this conduct was "extraconstitutional" and properly reserved for the legislature. (Docket #16 ¶¶ 88–91). It is not clear how this amounts to a due process claim. It appears that the County Defendants were equally puzzled. (Docket #24 at 17–18). In acknowledging that their claim does not have a basis in "prior developed theory of substantive due process," Plaintiffs ask,

> Does a law enforcement officer violate the due process rights
> of American citizens by declaring conduct criminal by fiat?
> And, does a law enforcement officer who knows that he has

no authority, violate the Constitution by deciding that the law emanates from him and not from duly enacted legislation?

(Docket #25 at 9).

Plaintiffs' first question is better addressed through the procedural and substantive due process claims, which are discussed below. Their second question is somewhat undercut by the ordinances appended to their amended complaint. To the extent that Plaintiffs attempt to articulate a separation-of-powers claim or contend that, notwithstanding the authority suggested by Kenosha County Ordinance 5.04(10), Beth's conduct was unconstitutional, these claims must be more clearly articulated. And, in any case, they would be properly raised under the Wisconsin State Constitution, not the federal Constitution and § 1983. "Given our adversary system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel." *Doherty v. City of Chicago*, 75 F.3d 318, 324 (7th Cir. 1996) (citations and quotations omitted). The Court grants the County Defendants' motion to dismiss Count One with prejudice. A claim that Beth violated the state constitution may not be vindicated under § 1983, which protects federal rights. However, Plaintiffs may attempt to invoke this Court's supplemental jurisdiction to allege a state-law-based claim.

## 4.2    Count 2 – Procedural Due Process

To state a claim for a procedural due process violation, Plaintiffs must allege "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) the failure to employ constitutionally adequate procedures." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 627 (7th Cir. 2016). "[T]he fundamental requirement of due

process is the opportunity to be heard at a meaningful time and in a meaningful manner[.]" *Doherty*, 75 F.3d at 323.

Plaintiffs allege that Beth deprived them of their rights to be "free from unlawful arrest[6] and free[] to express their opinions" when he "declared a state of emergency and curfew punishable by conviction." (Docket #16 ¶¶ 95–97). Plaintiffs have identified cognizable liberty interests in their freedom of expression. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 575 n.14 (1972) (observing that "[w]hen a State would directly impinge upon interests in free speech or free press, this Court has on occasion held that opportunity for a fair adversary hearing must precede the action, whether or not the speech or press interest is clearly protected under substantive First Amendment standards.") (citations omitted); *see also Iota Xi Chapter of Sigma Chi Fraternity v. Patterson*, 566 F.3d 138, 146–47 (4th Cir. 2009) (analyzing, in the context of a procedural due process claim, whether sanctions against a fraternity violated the members' First Amendment rights). Plaintiffs also identified a state action causing deprivation, (i.e., the imposition of a curfew by Beth).

"Once it is determined that due process applies, the question remains what process is due." *Dietchweiler*, 827 F.3d at 627 (citations and quotations omitted). In their response, Plaintiffs contend they had a right "to be heard through the democratic process." (Docket #25 at 11). But, as Plaintiffs recognize, they have not been deprived of their opportunity to be

---

[6]The Court will not address the allegations regarding unlawful arrest in Count Two because constitutional issues arising from arrests are properly brought under the Fourth Amendment. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 919 (2017) ("If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment.").

heard through the Kenosha County legislature, which is the democratic body that confers powers during a time of emergency, nor by the Wisconsin state legislature, which confers powers to the sheriffs. *Id.*; *see also* Wis. Stat. § 59.28 ("Sheriffs . . . shall keep and preserve the peace in their respective counties and quiet and suppress all affrays, routs, riots, unlawful assemblies and insurrections.").

Perhaps Plaintiffs contend that the appropriate process in this case would have been the one articulated in the Kenosha County Ordinances regarding emergencies—i.e., first the County Executive declares a state of emergency; *then* the County Executive (or, possibly, the Sheriff) institutes a curfew. *See supra* Kenosha County Ordinance 5.03. But the alleged failure to follow state procedure does not give rise to a due process claim; rather, it gives rise to a claim that Beth violated an ordinance when he declared an emergency. Moreover, Plaintiffs fail to explain the basis for their belief that Beth lacked authority to issue the curfew, regardless of whether there was a state of emergency. *See* Kenosha County Ordinance 5.04(10); Wis. Stat. § 59.28. The Court will dismiss this claim with prejudice. A claim that Beth violated an ordinance may not be vindicated under § 1983, which protects federal rights. However, Plaintiffs may attempt to invoke this Court's supplemental jurisdiction to allege a state-law-based claim.

### 4.3    Count 3 – Substantive Due Process

Plaintiffs also advance a substantive due process claim against the County Defendants. Substantive due process is a concept that has developed to protect against certain state actions regardless of the fairness of any procedural protections. *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998). It arises when a state action infringes upon a fundamental liberty interest, *Reno v. Flores*, 507 U.S. 292, 302 (1993), or when a state action is

"arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare," *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926). When fundamental rights are involved, a challenged action must survive strict scrutiny, meaning it must be "narrowly tailored to serve a compelling state interest." *Flores*, 507 U.S. at 302. Otherwise, the reviewing court employs only rational basis review, asking whether the action in question is rationally related to a legitimate state interest. *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003).

To the extent they intimate that Beth infringed upon their rights to a constitutional arrest, freedom of speech, or freedom of assembly, these issues are not properly raised as substantive due process claims. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that amendment, not the more generalized notion of substantive due process[,] must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citations and quotations omitted). In *Albright*, the Supreme Court held that the Fourth Amendment was the proper framework through which to challenge unconstitutional arrests. *Id.* Subsequently, the Seventh Circuit approved of this approach in the context of the First Amendment, explaining that the substantive due process framework was not appropriate where the "allegations invoke the protections against government interference with free speech that are guaranteed by the First Amendment." *Koutnik v. Brown*, 456 F.3d 777, 781 n.2 (7th Cir. 2006). Plaintiffs do not clearly allege that any other fundamental right is involved which would warrant application of strict scrutiny to Beth's conduct.

Thus, the Court will consider whether Plaintiffs have adequately alleged that Beth's emergency order was "arbitrary and unreasonable,

having no substantial relation to the public health, safety, morals, or general welfare." *Euclid*, 272 U.S. at 395. Plaintiffs use the word "arbitrary" several times in reference to Beth's curfew, but they have not explained why it was arbitrary to instate a curfew under the circumstances. Additionally, although they contend that Beth was not the correct party to issue the curfew, and that he did so in usurpation of the County Executive's power, they do not engage with the ordinances appended to the amended complaint, which may suggest otherwise. *See* (Docket #16-1). Moreover, Plaintiffs' amended complaint is silent on whether the curfew had a substantial relation to public safety or general welfare—and, cutting against them, the emergency curfews, which are also appended to the complaint, explicitly say that they are for safety. *See, e.g.*, (Docket #16-3).

Plaintiffs' response to the County Defendants' motion to dismiss ignores the no-rational-basis pleading requirement. They contend that "[w]hile Defendants may offer the context as a justification [for the curfew], that is only a justification for a validly enacted curfew. Nothing justifies this usurpation of the rule of law." (Docket #25 at 12). But that argument does not address the facts of this case—where the Sheriff may have had the authority to enact it, and where the act was, ostensibly, for public safety. This claim will be dismissed with leave to amend.

### 4.4 Count Seven – First Amendment

Plaintiffs bring a First Amendment claim against Kenosha County only. They do not explain what type of First Amendment claim they allege. Some of the amended complaint's language suggests that it is a facial challenge to the overbreadth of the curfew. (Docket #16 ¶¶ 134, 140); (Docket #25 at 12) (explaining that "the overbreadth doctrine of the First Amendment allows an attack on the facial validity of a statute"). Other

language, however, suggests a challenge to the curfew as it applies to public fora. (Docket #16 ¶¶ 136, 139, #25 at 13) (engaging with time, place, manner restriction caselaw). It appears that Plaintiffs' pleadings caused some confusion to the County Defendants, as well; they address the arguments regarding the overbreadth challenge but not the time, place, and manner challenge. (Docket #24 at 21, #27 at 10–11). The Court will dispose of the facial challenge to the curfew's overbreadth, which is a non-starter, and will grant leave to amend to more clearly allege a time, place, and manner claim so that Defendants may appropriately respond.

### 4.4.1 Facial Challenge to Curfew's Overbreadth

To succeed on a facial challenge that a law is overbroad, the challenger must typically establish that "no set of circumstances exists under which the law would be valid," or that the law "lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (citations and quotations omitted). In the First Amendment context, the Supreme Court has recognized another type of facial challenge, whereby "a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id.* at 473 (quotation omitted).

In the present case, Plaintiffs invoke "[t]he overbreadth doctrine" when referencing an attack on the "facial validity" of a state action. (Docket #25 at 12). They cite *Dombrowski v. Pfister*, in which the Supreme Court struck down an anti-communist statute on the grounds that the statute, which regulated expressive conduct, was, on its face, "unduly vague, uncertain and broad." 380 U.S. 479, 486 (1965). In the present case, the curfew does not plainly regulate expressive conduct, and Plaintiffs do not clearly allege that there are "no set of circumstances" under which the

Case 2:20-cv-01353-JPS   Filed 09/30/21   Page 16 of 36   Document 35

curfew would be valid, nor do they clearly allege that a "substantial number of [the curfew's] applications" would be invalid. *Stevens*, 559 U.S. at 472.

In fact, as Defendants point out, curfews imposed during emergencies have been upheld where the executive's actions were "taken in good faith and [where] there is some factual basis for [the] decision that the restrictions . . . were necessary to maintain order." *Moorehead v. Farrelly*, 723 F. Supp. 1109, 1114 (D.V.I. 1989). Plaintiffs do not contend that there was no emergency, nor that there were no factual bases for the curfew. Their allegations about bad faith are grounded in their supposition that Beth lacked authority to enact the curfew which, as the Court has discussed, is conclusory and undermined by the ordinances appended to their amended complaint and, therefore, not properly pled. The Court finds that Plaintiffs have failed to allege a violation on this ground.

### 4.4.2   Time, Place, Manner Restriction

Plaintiffs' second possible First Amendment claim purports to challenge the curfew as an unreasonable time, place, or manner restriction on public speech. "In order not to offend the First Amendment, a statute that regulates the time, place, and manner of expression must be (1) content neutral, (2) narrowly tailored to serve a significant governmental interest, and (3) allow for ample alternative channels for the expression." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1059 (7th Cir. 2004) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see also In re New York City Policing During Summer 2020 Demonstrations*, 2021 WL 2894764, at *18–19 (S.D.N.Y. July 9, 2021).

Although Plaintiffs discuss *Ward* and *Hodgkins* in their response, the allegations regarding the time, place, and manner restrictions are buried

Case 2:20-cv-01353-JPS   Filed 09/30/21   Page 17 of 36   Document 35

amidst overbreadth challenges. The amended complaint is not well pled. The claim will be dismissed with leave to amend.

### 4.5  *Monell* **Liability**

In the interests of judicial economy, the Court turns to the disputed *Monell* claims. A plaintiff may sue a municipality for constitutional violations brought about by (1) an express policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by an agent with "final policymaking authority." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009); *Monell*, 436 U.S. at 694–95. Plaintiffs proceed under the third theory of liability, contending that Beth is the "final policymaker for the Kenosha County Sheriff's Department, especially when it comes to the exercise of law enforcement functions," thus rendering Kenosha County responsible for decisions he makes in his official capacity. (Docket #25 at 6). Plaintiffs argue that although Beth lacked authority to issue the curfew, he was, nevertheless, the final policymaker on issues of law enforcement, which bears directly on the curfew mandate. The County Defendants, on the other hand, contend that while Beth had authority to enter the curfew, he was not a final policymaker for the purposes of *Monell* liability. (Docket #24 at 10–12, 13–15; #27 at 7–10). Attempting to navigate these precarious claims and defenses without conceding anything amounts to nothing short of obfuscation.

"Whether an official has final policymaking authority is a question of state law." *Fiorenzo v. Nolan*, 965 F.2d 348, 350 (7th Cir. 1992) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480 (1986)). "The challenged action must have been taken pursuant to a municipal policy." *Id.* "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority." *Id.* (citation and

quotation omitted). Kenosha County's Ordinances on emergency governance, which neither party comprehensively discuss, explain that "the County Executive has the authority to declare a local emergency." Kenosha County Ordinance 5.03(1). In a time of emergency, the County Executive has certain enumerated powers, including, "**[w]ithout restricting the power of the Sheriff**, to order a curfew for the general public or any segment of the general public in all or any portion of the County." *Id.* 5.04(10) (emphasis added). This limit indicates that the Sheriff has some curfew powers—either the power to order a curfew or to be exempt from a curfew.

The ordinances discuss the office of the Sheriff, *see* Kenosha County Ordinance 4.01 *et seq.*, but do not affirmatively delegate powers to the Sheriff; these powers appear to have a statutory source. *See* Wis. Stat. § 59.28 ("Sheriffs . . . shall keep and preserve the peace in their respective counties and quiet and suppress all affrays, routs, riots, unlawful assemblies and insurrections."). As far as the ordinances go, there is only a final limitation that the County Executive's emergency-time powers "**may not restrict the constitutional powers of the Sheriff** to use those resources, equipment and employees ordinarily under his direction and control and available to him to save lives and protect property." Kenosha County Ordinance 5.05(1) (emphasis added). Together, these laws demonstrate (1) the legislature's acknowledgement of either the Sheriff's curfew powers or the Sheriff's ability to operate regardless of a curfew; (2) a legislative mandate that the Sheriff must preserve the peace and "quiet and suppress all affrays"; and (3) a suggestion that those powers are derived from the constitution. Indeed, Article IV, Section Four of the Wisconsin Constitution provides for the creation of the office of the Sheriff. *See also Wis. Pro. Police Ass'n v. Dane*

*County*, 316 N.W.2d 656, 658–59 (Wis. 1982) (discussing the sheriff's historical common-law powers and describing the sheriff as "the first man in the county" to keep the peace) (citations omitted).

Thus, while it appears from the ordinances that Beth did not have authority to declare a state of emergency,[7] the laws contemplate that he may have the power to institute a curfew. Indeed, the Kenosha County Ordinances make clear that the Sheriff's emergency-time powers—whatever those may be—cannot be encroached upon by those of the County Executive. *Id.* 5.04(10), 5.05(1). This compels the conclusion that Beth *was* a final policymaker as far as the curfew was concerned.

Plaintiffs apparently overlooked these ordinances—both in failing to adequately allege a *Monell* violation and in claiming that Beth lacked authority to institute the curfew. Most regrettably, Defendants, too, neglected to bring these ordinances to the fore. *Monell* claims One and Two will be dismissed with prejudice because, as discussed above, there was no actionable constitutional violation. However, *Monell* claims Three and Seven will be dismissed with leave to amend.

The Court also takes this opportunity to address one final *Monell* issue raised by the County Defendants. For *Monell* liability to arise, the policy must be the "moving force behind the constitutional violation." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989) (quotation omitted). The County Defendants contend that there can be no liability in this case because there is "no underlying constitutional violation by a municipal

---

[7]Although, if the County Executive had been unavailable for whatever reason, the Sheriff would have been third in the line of succession. *Id.* 5.07.

employee," *Sallenger*, 630 F.3d at 504, in main part because Kenosha *City* police officers were responsible for enforcing the ordinance.

The County Defendants miss the forest for the trees. The cases they cite stand for the proposition that the unconstitutional policy must have resulted in a constitutional violation—if there was no constitutional violation, then there can be no *Monell* liability. *See Thompson v. Boggs*, 33 F.3d 847, 859 n.11 (7th Cir. 1994) ("[T]he jury verdict in favor of Officer Boggs on the question of whether he used excessive force precludes the possibility that Thompson could prevail on his *Monell* claim."); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *Sallenger*, 630 F.3d 504 (finding no *Monell* liability where "all three officers were cleared of any constitutional wrongdoing"). The County Defendants do not provide any legal authority demonstrating that the City Defendants were not bound by the curfew, which, in the end, may sever causation between the County Defendants' policy and the City Defendants' actions. If there is more persuasive or conclusive authority on point, then, as officers of the court, counsel for the County Defendants ought to consider it before filing another motion to dismiss on this issue.

## 5. THE CITY DEFENDANTS' MOTION TO DISMISS

Plaintiffs' claims against the City Defendants are more cogent. Count Four alleges a violation of Plaintiffs' Fourth Amendment rights against the City of Kenosha and Miskinis in his personal capacity. Count Five alleges a violation of Plaintiffs' rights under the Fourteenth Amendment's Equal Protection Clause against the John Doe officers and the City of Kenosha.

Count Six alleges a First Amendment retaliation claim against the John Doe defendants and the City of Kenosha. As above, the Court will determine, first, whether Plaintiffs have sufficiently alleged that an officer acting under color of law violated their constitutional rights. Once it is satisfied that a constitutional violation has been alleged, the Court will evaluate whether the City of Kenosha is responsible for a policy that was the moving force behind the violation.

### 5.1 Count Four – Unlawful Seizure

Plaintiffs allege that they were unlawfully seized in violation of the Fourth Amendment when the John Doe officers (hereinafter, "KPD officers") arrested them for violating the curfew. (Docket #16 ¶¶ 106–113). Notwithstanding these allegations, Plaintiffs bring the unlawful seizure claim against the City of Kenosha and Miskinis in his personal capacity.

"An essential predicate to any § 1983 claim for unlawful arrest is the absence of probable cause." *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998). Probable cause to arrest exist when "the facts and circumstances" within the officers' knowledge would reasonably suggest that the person committed an offense. *Id.* Plaintiffs contend that Beth lacked authority to institute a curfew and that Miskinis *knew* that Beth lacked authority to do so, but ordered the arrests anyway. Therefore, they argue, the arrests made based on curfew violations were without probable cause because there was no reason to believe the protestors were committing an offense. These allegations are attenuated and conclusory. There are no facts explaining why Plaintiffs believe Beth was without authority to institute the curfew, nor the basis for Plaintiffs' belief that Miskinis effectuated the arrests even though he *knew* Beth lacked authority to impose the curfew.

As discussed above, there was some legal indication that Beth had authority to issue a curfew. Wisconsin statutes mandate that "Sheriffs . . . shall keep and preserve the peace in their respective counties and quiet and suppress all affrays, routs, riots, unlawful assemblies and insurrections[.]" Wis. Stat. § 59.28. Wisconsin caselaw relies on the common law proposition that the sheriff is the leading keeper of the peace of a given county. *Wis. Pro. Police Ass'n*, 316 N.W.2d at 658–59. Based on the facts alleged and the law as it is written, and absent any other allegations regarding the applicability of a county curfew to the city, it would have been reasonable for Miskinis to learn of the curfew and issue an enforcement order. It would have been similarly reasonable for KPD officers to receive the curfew enforcement order from Miskinis and believe that a person violating curfew was committing an offense. *Brubaker v. King*, 505 F.2d 534, 537 (7th Cir. 1974) ("The test . . . under § 1983 is . . . whether the officer believed in good faith that the arrest was made with probable cause and whether that belief was reasonable.").

Plaintiffs do not allege that the county curfew did not apply to the city. Nor do Plaintiffs allege facts supporting their legal conclusion that the police officers knew that the curfew was phony or inapplicable to the City of Kenosha. What, aside from sheer speculation, is this claim based on? "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Additionally, Plaintiffs do not allege that Miskinis *personally* arrested anyone, such that he can be held liable for an unlawful arrest in his personal capacity. *Zimmerman*, 226 F.3d at 574. This claim will be dismissed with leave to amend.

### 5.2    Count Five – Equal Protection

Plaintiffs bring this claim against the City of Kenosha and KPD officers, alleging that their Fourteenth Amendment rights were violated when KPD arrested protesters but not counter-protestors, even though both protestors and counter-protestors violated curfew.[8] There are three basic ways in which to bring an equal protection challenge. First, a plaintiff may contend that a "state action . . . discriminates on the basis of membership in a protected class," such as race, national origin, or sex/gender. *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). Such actions are examined with strict scrutiny, which requires the state to show that the classification is narrowly tailored to serve a compelling government interest. *Midwest Fence Corp. v. U.S. Dep't. of Transp.*, 840 F.3d 932, 936 (7th Cir. 2016). Second, a plaintiff may contend that the state action burdens a group's exercise of fundamental rights. *Oklahoma v. Skinner*, 316 U.S. 535, 541 (1942). These challenges, too, are subject to the strict scrutiny test. *Id.*; *Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009). Third, a plaintiff may state a claim under a class-of-one theory, which requires allegations that a plaintiff was "irrationally target[ed] . . . for discriminatory treatment." *Reget*, 595 F.3d at 695. Plaintiffs seek to proceed on this third ground.

"A plaintiff alleging a class-of-one equal-protection claim must establish that (1) a state actor has intentionally treated him differently than others similarly situated, and (2) there is no rational basis for the difference in treatment." *Id.* (citation omitted). As to the first prong, Plaintiffs allege that the protesters were intentionally treated differently than the counter-

---

[8]The Court has some concern that the Equal Protection Clause claim, as alleged, is duplicative of the First Amendment claim; however, the parties do not discuss it. *Vukadinovich v. Bartels*, 853 F.2d 1387, 1387–89 (7th Cir. 1988).

Case 2:20-cv-01353-JPS    Filed 09/30/21    Page 24 of 36    Document 35

protesters because KPD arrested only protestors for violating curfew. In support of their "intentional" allegation, Plaintiffs allege that KPD only gave water to and fraternized with counter-protestors and made comments suggesting that KPD viewed the counter-protestors as allies. As to the second prong, Plaintiffs allege that there was no rational basis for the difference in treatment, given that the counter-protestors were armed, antagonistic, and also breaking curfew. These allegations sufficiently describe a situation in which KPD "intentionally treated [Plaintiffs] differently than others similarly situated," with "no rational basis for the difference in treatment." *Reget*, 595 F.3d at 695.

The Court is well-aware that police have broad discretion in carrying out their duties. *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007–08 (7th Cir. 2000). But this discretion is not absolute—if police acted out of "sheer malice, or because they had been bribed" rather than a "merely unexplained difference in police treatment," then an equal protection claim may exist. *See id.* at 1007–08. In the present case, Plaintiffs allege that KPD officers acted with intent to harass people who expressed criticism towards them, rather than with intent to protect the citizens and City of Kenosha. They allege that KPD officers ignored armed counter-protestors who violated curfew and arrested only the protestors who promoted a message of anti-police-brutality. They allege that KPD encouraged the armed counter-protestors by giving them water and enlisting their support in "dealing" with the protestors. Finally, they allege that one of the counter-protestors—who had previously received water from KPD officers—opened fire on the protestors on the third day of the nine-day protest, thereby swelling the vein of vindictiveness running through KPD's treatment of the protesters. The content of the Plaintiffs' protest is also

relevant: they publicly criticized KPD, and, they allege, KPD officers responded with hostility. These allegations are sufficient to state a claim against the KPD officers. "The officer motivated by malice alone is not exercising discretion and is not weighing the factors relevant to the officer's duties to the public." *Hanes v. Zurick*, 578 F.3d 491, 496 (7th Cir. 2009).

Defendants' citation to *Sutton v. City of Milwaukee* is unsuitable for the facts as alleged. 672 F.2d 644 (7th Cir. 1982). In *Sutton*, the Seventh Circuit held that it was not a violation of the Equal Protection Clause to tow "illegally parked cars . . . with more than one unpaid [parking] ticket" because this practice enabled the police to "enforce the parking regulations most severely against those who flout them most audaciously"—in other words, there was a rational basis for the action. *Id.* at 648. By contrast, in the present case, Plaintiffs allege that there was no rational basis to discriminate between protestors and counter-protestors when the counter-protestors were armed and had tried to kill some of the protestors. The "selective prosecution" in *Sutton* is entirely rational; it may be fairly described as "an effort. . . to get the most bang for the prosecutorial buck." *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995). Here, the "selective prosecution" is actionable against the KPD officers because Plaintiffs allege that they decided to arrest "in retaliation for the exercise of a constitutional right, such as the right to free speech" or motivated by animosity. *Id.* The claim for *Monell* liability as against the City of Kenosha will be evaluated in Section 5.4 *infra*.

### 5.3    Count Six – First Amendment Retaliation

Plaintiffs bring a First Amendment retaliation claim against KPD officers and the City of Kenosha. "[I]n most cases, probable cause to arrest defeats a claim of retaliatory arrest." *Lund v. City of Rockford*, 956 F.3d 938,

941 (7th Cir. 2020). Typically, if a police officer had probable cause to arrest a person, that person cannot bring a successful claim of First Amendment retaliation under § 1983. *Id.* However, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1728 (2019). The Seventh Circuit adopted Justice Gorsuch's view that this exception should be applied "commonsensically." *Lund*, 956 F.3d at 945 (quoting *Nieves*, 139 S. Ct. at 1734 (Gorsuch, J., concurring in part and dissenting in part)). Thus, "other kinds of evidence, such as admissions [that an action was taken in retaliation], might be enough to allow a claim to proceed." *Id.* (quoting *Nieves*, 139 S. Ct. at 1734 (Gorsuch, J., concurring in part and dissenting in part)). A court "must consider each set of facts as it comes . . . and in assessing whether the facts supply objective proof of retaliatory treatment . . . common sense must prevail." *Id.*

Here, Plaintiffs alleged that KPD officers arrested the protesters for violating the curfew, while the counter-protesters were left undisturbed. Plaintiffs also alleged that KPD officers evinced an intent to treat the protesters differently from the counter-protestors by, for example, thanking counter-protestors, giving water to counter-protestors, and telling counter-protesters that they, too, should partake in quelling the protestors. (Docket #16 ¶¶ 40–43). These allegations are sufficient to state a claim that, notwithstanding probable cause, the curfew was applied in violation of the First Amendment.

Turning to the merits of a First Amendment retaliation claim, a plaintiff "must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter

First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).

Plaintiffs allege that they protested police brutality, which is protected First Amendment activity. *Hodgkins*, 355 F.3d at 1057–58 (describing political protest as among "some of the purest and most protected forms of speech and expression"). Plaintiffs also suffered a deprivation—an arrest, a deprivation of liberty—that would likely deter First Amendment activity in the future. *Id.* at 1056 ("The Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights.") (citing cases). Finally, Plaintiffs allege that their anti-police-brutality stance was the motivating factor for their arrest. In support of this allegation, they point to the sheer number of protesters who were arrested and the comparative number of counter-protestors who were not, even though both broke curfew. Plaintiffs have adequately alleged a violation of their First Amendment rights against the KPD officers.

### 5.4   *Monell* **Liability**

Having determined that Plaintiffs sufficiently alleged two constitutional violations committed by KPD officers, the Court now turns to whether the City of Kenosha may be held liable for those alleged violations. Plaintiffs advance two theories of *Monell* liability against the City of Kenosha: first, that Miskinis, a municipal agent with "final policymaking authority," made the decision to only arrest protestors; second, that there was a pattern or practice of arresting only protestors, not counter-protestors, for which the City should be liable. *Darchak*, 580 F.3d at 629. The Court will address each theory in turn.

Again, the Court looks to Wisconsin law to determine whether Miskinis, the Chief of Police, was a final policymaker for the City of Kenosha. *Fiorenzo*, 965 F.2d at 350. Municipal liability flows from a final policymaker's decision only when that person makes "a deliberate choice to follow a course of action . . . from among various alternatives." *Congine v. Village of Crivitz*, 947 F. Supp. 2d 963, 975 (E.D. Wis. 2013) (citation and quotation omitted) (finding a chief of police had final policymaking authority on the issue of how to handle a parade). "[T]he police chief is charged with the command and rule-making responsibilities for the police department under Wisconsin law." *Chortek v. City of Milwaukee*, 356 F.3d 740, 749 (7th Cir. 2004) (citing Wis. Stat. § 62.09(7)(c) & (13)(a)). In *Chortek*, the Seventh Circuit found no *Monell* liability under a "final policymaker authority" theory where there was no evidence that the police chief was involved in developing an arrest policy. *Id.* Nonetheless, Wisconsin's statutes *also* explain that the chief of police acts "under the direction of the mayor" and is required to obey the "lawful written orders of the mayor or common council." Wis. Stat. § 62.09(13)(a).

The Court accepts Plaintiffs' allegations that, as Chief of Police, Miskinis was the final policymaker regarding how the curfew should be enforced. It is true that, under state law, Miskinis serves at the direction of the mayor, *see* Wis. Stat. § 62.09(13)(a), but this does not foreclose Plaintiffs' allegations that he was the person responsible for enforcement priorities during a protest, *see Congine*, 947 F. Supp. 2d at 975. The amended complaint alleges that on the second night of curfew—August 24—Miskinis "directed his officers to arrest protestors for violating this curfew." (Docket #16 ¶ 25). He gave this direction again on August 25 and August 26. The complaint sufficiently alleges that Miskinis acted at his discretion to order the arrests.

Nonetheless, Plaintiffs have not adequately alleged that Miskinis's actions were the but-for cause of their First and Fourteenth Amendment constitutional violations. For *Monell* liability to attach, the municipality's action "must be closely related to the ultimate injury" that the plaintiff suffered. *Harris*, 489 U.S. at 391. Here, the amended complaint contains no allegations that Miskinis's arrest instructions were aimed only at the protestors, rather than the counter-protestors. In other words, there are no facts alleging that Miskinis's arrest order was the "moving force" of the constitutional violations suffered.

Specifically, the amended complaint alleges that Miskinis knew the emergency order (presumably, the curfew) was unlawful, but that he ordered arrests of "protestors" anyway. (Docket #16 ¶ 72). This Order has been using the term "protestors" to refer to anti-police-brutality protestors and "counter-protestors" to refer to the police supporters. The amended complaint, on the other hand, variously refers to "anti-police brutality protestors," and "pro-police protestors." *See, e.g., id.* ¶¶ 46, 48, 50. Thus, when the amended complaint alleges that Miskinis ordered arrests of "protestors," it is an undiscriminating statement—by the terms of that complaint, Miskinis's order could apply to either "anti-police brutality protestors" or "pro-police protestors." There are no other allegations in the amended complaint indicating that Miskinis intended the arrest order to apply only to Plaintiffs and their associates. Certainly, the Court can surmise what Plaintiffs meant, given the context of the allegations, but it is not the Court's job to surmise—it is Plaintiffs' role to allege facts that support a legal conclusion. The *Monell* claims predicated on Miskinis's final policymaking authority will be dismissed with leave to amend.

Case 2:20-cv-01353-JPS   Filed 09/30/21   Page 30 of 36   Document 35

In addition to alleging that Miskinis was a final policymaker, Plaintiffs' amended complaint also alleges that KPD had an unofficial policy, practice, or custom of enforcing the curfew only against protectors. Additionally, Plaintiffs allege that KPD failed to train and supervise their officers with respect to Plaintiffs' First Amendment rights. *Id.* ¶¶ 125–26. The function of these theories of *Monell* liability—i.e., a custom of discriminatory enforcement and a failure to train—are to hold a municipality liable for unconstitutional practices that have "not been formally approved by an appropriate decisionmaker" but which are "so widespread as to have the force of law." *Bd. of Cnty. Commissioners of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

To proceed under these theories, Plaintiffs must allege (1) a violation of their constitutional rights caused by a municipal practice; and (2) that the practice was "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006) (overruled on other grounds)). Demonstrating municipal acquiescence to a practice requires more than allegations of one or two mistakes. *Id.* Rather, acquiescence requires allegations of "systemic and gross deficiencies" that policymakers knew of and failed to correct, thereby "manifesting deliberate indifference." *Id.* Similarly, where a failure to train is alleged, the plaintiff must plead facts alleging that the "gap" in the defendant's policies reflected a decision to act unconstitutionally. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

In very rare instances, even a single constitutional violation, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential

for such a violation, could trigger municipal liability." *Brown*, 520 U.S. at 409 (citing *Harris*, 489 U.S. at 390). This extremely limited class of *Monell* liability applies only to situations where "a violation of federal rights may be a highly predictable consequence of a failure to equip [officials] with specific tools to handle recurring situations." *Id.* Later, the Supreme Court explained that it "sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick v. Thompson*, 563 U.S. 51, 64 (2011).

Plaintiffs concede that on the first day of the curfew—August 23—a pattern or practice of unconstitutional curfew enforcement was not clearly established. The same would be true of August 24, the first date that Miskinis allegedly ordered enforcement of the curfew. (Docket #16 ¶ 25). However, Plaintiffs allege that, over the course of the week that followed, the City of Kenosha was not only aware of the unequal enforcement of the curfew, but also knowingly enforced the curfew differently. In support of this claim, Plaintiffs allege that, over the span of a week, (1) not a single counter-protestor was arrested; (2) on August 25, after Kyle Rittenhouse killed two protestors, KPD knew that armed counter-protestors may pose danger to protestors; (3) KPD nevertheless "pushed" protestors towards the counter-protestors in order for counter-protestors to "deal" with them (*id.* ¶ 40); and (4) KPD expressed friendliness towards the counter-protestors by thanking them for their help and giving them water.

These allegations indicate "systemic and gross deficiencies" that policymakers, such as Miskinis, knew of and failed to correct, thereby "manifesting deliberate indifference" to the protestors' constitutional rights. *Hildreth*, 960 F.3d at 426. Plaintiffs also allege that there was a failure

to train for the First Amendment retaliatory arrest claims, explaining that (1) Miskinis did not issue "corrective instructions" after the initial violations were "brought to light"; and (2) that Miskinis's failure to train officers to enforce the curfew in a viewpoint-neutral manner was certain to result in additional constitutional rights violations. (Docket #16 ¶ 125). It will ultimately fall to the fact finder to determine whether, in fact, such a pattern or practice was established, or whether Miskinis did, in fact, know that his failure to train his officers was resulting in discriminatory arrests. Nonetheless, at this juncture, the Court finds the allegations in the amended complaint are sufficient to allege *Monell* liability based on (1) a custom and practice of arresting only protestors, in violation of Plaintiffs' First and Fourteenth Amendment rights; and (2) a failure to train KPD officers to avoid discriminatory arrests, in violation of Plaintiffs' First Amendment rights.

6. **QUALIFIED IMMUNITY**

A motion to dismiss is rarely "the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim." *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020) (citations omitted). The County Defendants did not raise qualified immunity in their moving brief; additionally, all claims against them were dismissed.

As for the City Defendants, the Court briefly addresses their legal argument that the rights protecting against discriminatory arrest were not clearly established at the time the violations allegedly occurred. "[A]rrests motivated by personal animus are unconstitutional." *Hanes*, 578 F.3d at 496 (finding qualified immunity did not apply in a class-of-one equal protection claim against an individual who alleged that he was repeatedly arrested

because the police did not like him). The right to be free from retaliatory arrest for conduct that typically is not prosecuted is similarly well-established. *See Nieves*, 139 S. Ct. at 1727 (explaining that a retaliatory arrest claim would lie "if an individual who has been vocally complaining about police conduct" were arrested for jaywalking at an intersection where "jaywalking is endemic but rarely results in arrest").

The City Defendants' reliance on *Wood v. Moss*, 572 U.S. 744 (2014) is unpersuasive. *Wood* marks the third time in history that the Supreme Court addressed a constitutional challenge to Secret Service actions. *Id.* at 758 n.6. That case concerned President George W. Bush's re-election campaign trail and an unplanned stop at an inn for dinner. *Id.* at 747–48. People who followed the campaign—both protestors and supporters—came out to be seen and heard by his motorcade as he passed through town. *Id.* at 749. However, when the President unexpectedly decided to stop for dinner at the inn, the motorcade strayed from its intended path and onto "the block where the protesters had assembled." *Id.* 749. From where the protestors stood, they were "within weapons range" of the President. *Id.* at 751. By contrast, the supporters stood a block away, in an area where a large, two-story building "blocked sight of, and weapons access to," the President. *Id.* Thus, two Secret Servicemen, tasked with ensuring the President's safety, moved the protestors out of the way—and, in doing so, moved them "a block farther away from the [i]nn than the supporters." *Id.* at 748. A viewpoint discrimination challenge followed.

In a unanimous opinion, the Supreme Court held that the agents were entitled to qualified immunity on *very* specific grounds: it was not clearly established that the Secret Service agents had a "First Amendment obligation to ensure that groups with different viewpoints are at

comparable locations at all times," and, therefore, the agents' actions, which were supported by "a valid security reason," were not actionable. *Id.* at 759–63. In so holding, the Supreme Court explained, "nowhere . . . is accommodation for reasonable error . . . more important than when the specter of Presidential assassination is raised." *Id.* at 758 (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

Clearly, *Wood* exists in a different universe from the core facts of this case. There is considerable caselaw detailing the constitutional obligations and restraints of police officers, and it is well-established that police officers may not arrest someone simply because they dislike them or disagree with them. *See Hanes,* 578 F.3d at 496; *Nieves*, 139 S. Ct. at 1727. At this juncture, the Court cannot say, as a matter of law, that the City Defendants are entitled to qualified immunity.

### 7.  CONCLUSION

The causes of action alleged in this complaint are serious, but they are also confusingly pled. The fact that two claims moved forward—the First and Fourteenth Amendment claims against John Does and the City of Kenosha—is more a testament to probability than careful drafting. In some cases, the Court has given Plaintiffs leave to amend. If Plaintiffs decide to file a second amended complaint with similarly scattershot allegations, those newly pled claims will be summarily dismissed.

Accordingly,

**IT IS ORDERED** that Defendants' motions to dismiss Plaintiffs' complaint (Docket #6, #11) be and the same are hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that the City Defendants' motion to dismiss Plaintiffs' first amended complaint (Docket #17) be and the same is hereby **GRANTED in part**;

**IT IS FURTHER ORDERED** that the County Defendants' motion to dismiss Plaintiffs' first amended complaint (Docket #23) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Counts One and Two of Plaintiffs' first amended complaint, brought against Sheriff David Beth in his individual capacity and Kenosha County, be and the same are hereby **DISMISSED with prejudice**;

**IT IS FURTHER ORDERED** that Count Three of Plaintiffs' first amended complaint, brought against Sheriff David Beth in his individual capacity and Kenosha County, be and the same is hereby **DISMISSED with leave to amend**;

**IT IS FURTHER ORDERED** that Count Seven of Plaintiffs' first amended complaint, brought against Kenosha County, be and the same is hereby **DISMISSED with leave to amend**;

**IT IS FURTHER ORDERED** that Count Four of Plaintiffs' first amended complaint, brought against the City of Kenosha and Daniel Miskinis in his individual capacity, be and the same is hereby **DISMISSED with leave to amend**; and

**IT IS FURTHER ORDERED** that, if Plaintiffs decide to file a second amended complaint, they must do so within **21 days of the date of this Order**.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2021.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge